**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN B. ALMANZAR,<br><br>                     Plaintiff,<br><br>   - against -<br><br>EXPERIAN INFORMATION SOLUTIONS,<br>INC.,<br><br>                   Defendant. | Case No.: 1:25-cv-00110<br><br><br>**COMPLAINT AND DEMAND**<br>**FOR JURY TRIAL** |

Juan B. Almanzar ("Plaintiff" or "Mr. Almanzar"), by and through the undersigned counsel, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Defendant" or "Experian") and states as follows:

**INTRODUCTION**

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Reporting Bureaus (like Experian)

acknowledge this potential for misuse and resulting damage every time they sell their respective

credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in

a boon for the companies that accumulate and sell data concerning individuals' credit histories and

other personal information. Such companies are commonly known as consumer reporting agencies

("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords,

lenders, potential employers, and other similar interested parties), commonly called "consumer

reports," concerning individuals who may be applying for retail credit, housing, employment, or a

car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. §

1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable

procedures "to assure maximum possible accuracy" of the personal, private, and financial

information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible

accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate
> credit reports directly impair the efficiency of the banking system, and unfair credit
> reporting methods undermine the public confidence which is essential to the
> continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all
> sorts of computerized data banks, the individual is in great danger of having his life
> and character reduced to impersonal "blips" and key-punch holes in a stolid and

unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec.

36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiff's claims arise out of the Defendant's blatantly inaccurate or materially misleading credit reporting, wherein the Defendant reported to Plaintiff's potential creditors that Plaintiff had a collection associated with a child support enforcement obligation.

12.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information that Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14.     Juan B. Almanzar ("Plaintiff" or "Mr. Almanzar") is a natural person residing in Bronx, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of Florida, including within this District.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTS**

**A.    Summary of the Fair Credit Reporting Act**

19.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to

ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.    Factual Background**

24.    The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

25.    The Credit Reporting Bureaus (like Experian) sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

26.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Reporting Bureaus (Like Experian), are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.    The Defendant's consumer reports generally contain the following information:

(a)    Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)    Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)    Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29.    Defendant obtains consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

30.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions.

31.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Defendant's consumer reports.

32.    The information the Defendant includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

33.     FICO Scores are calculated using information contained in the Defendant's consumer reports.

34.     Defendant knows that FICO and other third-party algorithms (as well as the algorithms owned by Defendant) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

35.     Defendant routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

36.     Defendant fails to employ reasonable procedures to assure the maximum possible accuracy of the information that it reports about consumers, including but not limited to, account balances, account statuses, payment histories, payment statuses, and inaccurate collection notations.

37.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against Defendant for its inaccurate credit reporting.

38.     Thus, Defendant is on continued notice of its respective inadequate reporting procedures. Specifically, Defendant is aware that its inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, payment statuses, and inaccurate collection notations.

39.     Defendant has received and documented many disputes from consumers complaining that Defendant reported inaccurate information about them.

**C.      Plaintiff's Child Support Enforcement Account**

40.      On December 6, 2012, the Commissioner of Social Services ("Commissioner") filed a Petition against Plaintiff under Article 4 of the Family Court Act, requesting an order for support directing Plaintiff to pay fair and reasonable support for his two children.

41.      The Support Magistrate ordered that effective July 6, 2013, Plaintiff is charged with the support of his two children in the amount of $250.00 per month, and that these required payments are to be made to the Commissioner through the Support Collection Unit.

42.      In accordance with the Court Order, Plaintiff diligently made all such payments, and followed the instructions of the child support enforcement agency every time Plaintiff received a letter from the child support enforcement agency requesting payment.

43.      Under New York law, except for circumstances not present in this case, child support automatically terminates when the child turns 21 years of age.

44.      Mr. Almanzar's children turned 21 years of age on August 7, 2019.

45.      Sometime in or around August of 2019, Plaintiff received a letter from the child support enforcement agency stating that he owed $500.00 in child support payments.

46.      He discovered that a child support payment in the form of a money order that had been stolen from the U.S. mail and cashed by someone other than the child support agency.

47.      Therefore, according to the child support agency, he owed $250.00 for the month in which his money order was stolen, and another $250.00 for August 2019, which is the same month his children turned 21.

48.      Plaintiff contacted the child support enforcement agency, informed them of the theft that had occurred the month before, and promptly paid the entire $500.00.

49.     With this payment that was completed on October 4, 2019, Plaintiff's child support enforcement account was closed because his children had reached the age where support obligations ceased.

50.     The child support enforcement agency records contain no record that it placed Plaintiff in collections. The child support enforcement agency records contain no record that the Plaintiff was delinquent, in arrears, or in collection in September of 2019.

**D.     Defendant Reports a Collection Notation Associated with Plaintiff's Closed Child Support Enforcement Account**

51.     On or around May 22, 2023, Plaintiff sought to secure an auto loan from Santander to purchase and refurbish a vehicle for a new business venture focused on transporting senior citizens.

52.     Plaintiff visited his local Santander Bank branch, where he met with a Spanish-speaking Santander representative to whom he communicated his desire for an auto loan.

53.     Plaintiff is a Spanish-speaker.

54.     Plaintiff neither speaks nor reads the English language.

55.     When Plaintiff must understand something spoken or written in English, he relies on others to translate for him.

56.     Santander presented him with documents that he believed was an application solely related to an auto loan application, which he then signed.

57.     Unbeknownst to him, Santander also presented him with an application for an ultimate cash back credit card, which Plaintiff signed.

58.     Therefore, in actuality, he submitted both the completed auto-loan application as well as an ultimate cash back credit card application.

59.    Plaintiff's credit card application was therefore submitted, initiating an automated credit evaluation process whereby Santander obtained Plaintiff's credit report from Defendant.

60.    Defendant's report about Plaintiff communicated a "B0009" payment history code about Plaintiff's child support enforcement account, which was explained in the very next payment history column of the report to mean "Current account/was a collection account, insurance claim or" other – "government claim or terminated for default."

61.    The "B0009" code which Defendant furnished about Plaintiff's child support enforcement account was produced because of an alleged collection notation associated with Plaintiff's child support enforcement account.

62.    This "B0009" code reported about Plaintiff's child support enforcement account automatically caused a denial in Santander's automated underwriting system for this credit product.

63.    On or about May 22, 2024, Santander issued an adverse action notices for both the loan application and the credit card conveying the following reasons for Defendant's denial of Plaintiff's credit card application based on an Experian report that he had: "One or more Chargeoff, Bankruptcy, Judgement or Repossession."

64.    Shortly thereafter, Plaintiff received this written adverse action notice in th email with the inapplicable reasons causing him to feel panicked, baffled, confused, and bewildered by the denial because he had no "Chargeoff, Bankruptcy, Judgement or Repossession." The loan application was denied via electronic message.

65.    Plaintiff is not a wealthy individual and thus relies on his excellent credit standing to safeguard himself in emergency situations that may require funds beyond his immediate means.

66.     Plaintiff was confused and distressed by this information thinking that his Experian credit report was going to harm his credit standing and credit worthiness.

67.     Plaintiff worried that his Experian report may have been compromised by notations that had no relevance to him—namely, the inapplicable and irrelevant reasons provided for the denial by Santander.

68.     Plaintiff was even left to think that perhaps the inapplicable and irrelevant reasons provided by Santander were pretextual, possibly due to an underlying discriminatory and nefarious purpose relating to his race, ethnicity, immigration status, or address information.

69.     Plaintiff subsequently obtained his Experian consumer disclosure to review it for "One or more Chargeoff, Bankruptcy, Judgement or Repossession."

70.     Upon reviewing the disclosure that he initially obtained from Experian provided to him, he could readily see that there was no "Chargeoff, Bankruptcy, Judgement or Repossession" listed at all.

71.     Plaintiff sued Santander for violations of the Equal Credit Opportunity Act because it failed to provide him with the specific and principal reason for taking adverse action against him, crippling his ability to effectively dispute and remedy the inaccuracies in his consumer reports.

72.     He learned only through litigation that the true reason that Santander declined the application was based on the "9" appearing in his Experian report, not that he had "One or more Chargeoff, Bankruptcy, Judgement or Repossession."

73.     After learning that the "9" code appeared in his Experian report due to a "collection" notation in his child support tradeline, he underwent a review of his credit reports and learned that Defendant was falsely reporting a collection notation regarding his child support

enforcement account that was terminated by law in August of 2019, and which had been paid and closed in October of 2019.

**E.    Plaintiff's First Dispute to the Defendant Regarding the Inaccurate Credit Reporting**

74.    On or about June 7, 2023, extremely distressed and believing that the Defendant had inaccurately reported "One or more Chargeoff, Bankruptcy, Judgement or Repossession" to Santander, Plaintiff mailed a written dispute to Experian that it was inaccurately reporting to Santander false information.

75.    Plaintiff provided a copy of his government-issued picture identification, additional proof of his identity and address, a copy of his Experian disclosure, and a copy of the Santander adverse action letter as attachments to his dispute.

76.    Plaintiff signed his dispute.

77.    Because "One or more Chargeoff, Bankruptcy, Judgement or Repossession" are completely inapplicable to child support enforcement tradelines, such reporting would unquestionably be inaccurate.

78.    In fact, Experian does not report judgments in consumer reports such as the one it sold to Santander about the Plaintiff.

79.    Plaintiff's Experian disclosure did not show any collection accounts in the "collections" section of the report.

80.    Plaintiff's Experian disclosure showed no bankruptcy in the public records sections.

81.    Plaintiff's Experian disclosure did not show any chargeoffs or repossessions of any kind.

82.    All of Plaintiff's credit accounts were in good standing.

83.     Plaintiff's Experian disclosure showed one "potentially negative month" in the child support tradeline indicated by a "C," meaning "collection," in one month – September of 2019, but "current/terms met" in all other months reporting after that.

84.     However, Plaintiff's Experian disclosure explicitly stated: "no collection accounts reported."

85.     In Plaintiff's dispute, he explained that on or about May 22, 2023, Experian provided inaccurate and/or misleading consumer information about him to Santander, which caused Santander to deny Plaintiff credit application.

86.     Plaintiff stated that none of these items were true, and that he has no such items on his Experian consumer report that he obtained through the internet.

87.     Plaintiff requested that Experian reinvestigate the disputed information, correct or delete the reporting, and send him a corrected copy of his credit report and full file.

**F.    Defendant Experian's Unreasonable Dispute Reinvestigation**

88.     Upon information and belief, Defendant Experian failed to review any of the information provided to it by Plaintiff in support of Plaintiff's dispute.

89.     Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's June 7, 2023, dispute.

90.     Thereafter, Defendant Experian failed to correct or delete the collection notation appearing in Plaintiff's credit file.

91.     Instead of conducting a reinvestigation or forwarding Plaintiff's dispute to the furnisher of the information from New York child support enforcement agency, Defendant instead sent Plaintiff a dispute response stating that it refused to reinvestigate because Plaintiff's dispute does not appear to be sent directly by Plaintiff or any authorized party.

92.    This was false.

93.    Upon information and belief, Experian did not open Plaintiff's dispute.

94.    Upon information and belief, Experian did not even review the information on the envelope in which the dispute was mailed to Experian.

95.    Experian merely reviewed a few envelopes in each batch of mail it received according to its suspicious mail policy.

96.    Upon information and belief, each batch of mail it receives at this address designated for consumer disputes contains more than 100 pieces of mail.

97.    Experian's suspicious mail policy states that a sorter is to evaluate each piece of mail for certain "listed" characteristics that might suggest a letter is not from the consumer.

98.    These characteristics are not based on any objective evidence that the consumer did not provide the information in the dispute.

99.    These characteristics are not based on any objective evidence that the consumer did not authorize the dispute.

100.    These characteristics are not based on any objective evidence that the consumer did not sign the dispute.

101.    These characteristics are not based on any objective evidence that the dispute was frivolous.

102.    These characteristics are not based on any objective evidence that the dispute was irrelevant.

103.    For example, the "suspicious" characteristics in Experian's policy include envelopes that are "similar" in type or size; envelopes that contain "similar" ink color or font;

letters with a "similar letter format"; "hand addressed envelopes" with "a typed letter"; and "[u]nique handwriting."

104.    Other suspicious characteristics include "[a] signature found on [an] attachment" that differs from "the signature on the letter"; "[d]ata on an attachment document [that] appears to have been manipulated"; "[d]ata on an attachment document [that] does not appear logical"; a "return address [on the letter itself] which differs from the return address appearing on the envelope"; and "[a] series of envelop[e]s where the postmark is in the same city but the return address[es] are in different cities."

105.    When five or more letters from different consumers in a batch of mail contain the same listed characteristic, the policy counsels that a sorter can "reasonabl[y] . conclude that the[y] . may not have been mailed by the consumer" and mark them suspicious.

106.    Upon information and belief, Experian only examines these few envelopes to see if there are indicators that the consumer utilized a mailing service such as Stamps.com to send in their dispute.

107.    By way of example, Stamps.com is only one of a number of mailing services that allow consumers to conveniently send U.S. postal mail using a computer from anywhere, without needing a personal printer, ink, paper, or to have to affix stamps or go to a post office/post box.

108.    Experian knows that mailing services such as Stamps.com are utilized by consumers throughout the United States.

109.    Upon information and belief, Experian examines these few envelopes to see if there are indicators that the consumer received *assistance* in mailing the dispute.

110.    Experian does not review the envelopes to determine whether the dispute is irrelevant.

111.    Experian does not review the envelopes to determine whether the dispute is frivolous.

112.    Experian cannot determine whether the dispute was authorized by the consumer from examining the envelope.

113.    Experian cannot determine whether the dispute was frivolous by examining the envelope.

114.    Experian cannot determine whether the dispute was irrelevant by examining the envelope.

115.    Experian cannot determine whether the dispute was *bona fide* by examining the envelope.

116.    Experian must treat every dispute as a *bona fide* dispute unless it can determine that it is frivolous or irrelevant.

117.    Experian is required by the FCRA to transmit disputes and all relevant documentation to the furnisher of disputed information.

118.    Upon information and belief, if Experian determines that the sample envelopes have utilized a mailing service, Experian determines that the entire batch was not sent directly by consumers.

119.    Upon information and belief, without ever reading the disputes in the batch, Experian does not promptly commence a reinvestigation for any of the disputes in the batch.

120.    Experian also chooses to refuse to reinvestigate consumer disputes based on criteria such as whether the envelope is "thin," "big," or "clean," regardless of whether it appears to have been posted by a mailing service.

121.    Upon information and belief, by refusing to commence a reinvestigation, Experian saves money for itself.

122.    Upon information and belief, it does not matter to Experian whether a consumer supplies photo identification or other proof of identity, unless the envelope first passes the sorting phase, it will not be investigated unless it has an ink signature. Even so, if a dispute is rejected as part of a batch, whether it is signed in ink by a consumer will not cause Experian to reinvestigate.

123.    There is no exception in the FCRA that allows a consumer reporting agency to delay or avoid promptly investigating a consumer dispute unless consumers provide a copy of government issued identification, other proof of identity or address, or even a signature.

124.    Upon information and belief, Experian sends a letter to all the consumers whose disputes were in the batch stating that the dispute did not appear to come directly from the consumer -- without reading the dispute or considering any documentation included in the dispute.

125.    Consumers are within their rights to utilize any mailing service to send their disputes through the U.S. Postal mail to Experian.

126.    Consumers are permitted to receive help in disputing inaccuracies on their consumer reports.

127.    Consumers who authorize disputes to be sent to Experian have rights under the FCRA to have their disputes promptly reinvestigated by Experian.

128.    Consumers who sign their disputes have rights under the FCRA to have their disputes promptly reinvestigated by Experian.

129.    Consumers who provide the information that is included in their written disputes are within their rights to have their disputes promptly reinvestigated by Experian.

130.    Experian has internal information that if it refuses to promptly conduct a reinvestigation by determining that a batch of mail may have been sent by a mailing service, it will save money.

131.    Experian has interpreted the FCRA to allow it to delay or refuse disputes where consumers utilize a mailing service such as Stamps.com to send their disputes.

132.    The FCRA does not require consumers to send disputes through the U.S. Postal mail in envelopes that the consumers themselves address, lick and seal, affix postage, and physically place in a mailbox.

133.    Upon information and belief, Experian implemented its suspicious mail policies not only to save itself money, but also to drive consumers into telephone or online disputes where they can be tricked into giving up valuable rights such as data privacy and a right to file a lawsuit under the federal and state consumer protection laws.

134.    By refusing to reinvestigate mail disputes, Experian induces consumers to dispute electronically utilizing an online dispute system, where it cannot determine if the consumer is receiving assistance from anyone to make the dispute.

135.    Experian induces consumers to sign up for one of its credit monitoring products in order to obtain their consumer disclosures and to dispute inaccuracies.

136.    Courts have found Experian's suspicious mail policy to be unreasonable, but Experian continues to refuse to conduct reinvestigations according to these policies that it has called "sorting" and "credit clinic" policies, among other euphemisms.

137.    After initially refusing to reinvestigate based on its suspicious mail policy, Experian has received confirmation from more than 100 consumers that they had, in fact, made a direct dispute to Experian.

138.    Experian maintains the suspicious mail policy despite its knowledge that it causes harm to consumers who send bona fide direct disputes, including the harm it caused the Plaintiff.

139.    Upon information and belief, Defendant did not review any of the information provided to it by Plaintiff.

140.    Defendant failed to reinvestigate Plaintiff's June 2023 dispute without any legitimate reason to do so.

141.    Experian's failure to remove the false information poses an imminent threat of future harm to the Plaintiff whenever a user requests his consumer report from Experian.

142.    Experian knew or should have known that its suspicious mail policy violated the Plaintiff's consumer rights based disputes it has received from consumers, regulatory agency complaints and substantial written material, court decisions, lawsuits, and other widely available public information.

143.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff, since it continued to report disputed information despite being on notice of the inaccuracy of such information.

144.    The Plaintiff experienced the very harms that congress enacted the FCRA to prevent and address: inability to dispute and correct inaccurate or misleading information in a consumer report. If it were not for the FCRA, the Plaintiff would have causes at common law for injuries caused by invasion of privacy, defamation, intrusion upon seclusion, and false light.

145.    Defendant violated 15 U.S.C. § 1681i by utilizing its suspicious mail policy that it know results in its failing to conduct a reasonable investigation of bona fide consumer disputes by refusing to even consider Plaintiff's March 2024 dispute, let alone conduct any reinvestigation

whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

146.    Defendant violated 15 U.S.C. § 1681g(a)(1) for its failure to provide the Plaintiff with a copy of his credit file upon request despite the fact that he made such a request and provided proof of his identity.

147.    Experian had no legitimate reason to refuse to provide the Plaintiff with a copy of his full credit file upon request.

148.    Experian refused to conduct a reasonable reinvestigation of Plaintiff's dispute tendered June 7, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

149.    Experian failed to do the very bare minimum required of it under the FCRA, which is to transmit the dispute and all relevant information to the furnisher of the disputed information pursuant to 15 U.S.C. § 1681i(a)(2).

## G.    Plaintiff's Second Dispute to Defendant Regarding the Inaccurate Credit Reporting

150.    As of September 16, 2024, Defendant was still reporting that Plaintiff has a collection notation associated with his child support enforcement account which was paid and closed on October 4, 2019.

151.    In or about September of 2024, the Plaintiff had learned new information that Defendant's reported to Santander a code indicating that any one of numerous derogatory conditions existed in the Plaintiff's closed child support tradeline.

152.    Plaintiff again mailed a written dispute to Experian challenging the inaccuracy Experian reported to Santander through its conveyance of a "B0009" code, which could mean any one of numerous derogatory statuses that were completely false or misleading.

153.    Plaintiff's signed dispute was mailed certified, return receipt requested, in the U.S. Mail, in a handwritten envelope containing his proof of identity, his Experian consumer disclosure, Santander adverse action notice, as well as his New York child support enforcement agency "Child Support Enforcement Account Resolution Notice" and child support court records.

154.    To the extent that the "B0009" code was intended to relate that the Plaintiff's child support enforcement account was in collections, the report was false or misleading.

155.    The Plaintiff provided his child support records from the child support enforcement agency as evidence demonstrating as a matter of fact that his account had not been in collections, nor do the records show it was even 30 days in arrears in September of 2019.

156.    This was easily verifiable for Experian who could refer to information in the Plaintiff's file including that there was only one potentially negative month in the child support account.

157.    Even if there had been a 30-day late notation, Experian does not consider 30-days late to be a derogatory item.

158.    Experian explicitly reported that there were no collections accounts in the specific collections account segment of the Plaintiff's report.

159.    Thus, reporting September 2019 as in arrears or in collection was not only inconsistent with the evidence the Plaintiff supplied, but it was also contradicted by other information that Experian knew or should have known.

160.    Experian also transmitted this information to Santander, which ignored the Experian instructions to utilize only the "9" code to deny the Plaintiff's credit application.

161.    Experian allowed Santander to use the report it sold about the Plaintiff and rewrite the meaning of the "9" code to erroneously mean a chargeoff, bankruptcy, judgement, or repossession.

162.    The Experian "B0009" code, which Defendant used to convey that a collection notation was being reported about Plaintiff's child support enforcement account, Plaintiff disputed the collection notation that Defendant was inaccurately reporting about him.

163.    Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

**H.    Defendant Experian's Unreasonable Reinvestigation**

164.    Upon information and belief, Defendant Experian refused to conduct any reinvestigation of the Plaintiff's September 16, 2024, dispute, utilizing the same illegal suspicious mail policy described in paragraphs 88 through 149.

165.    Specifically, on September 24, 2024, Defendant responded to Plaintiff's dispute stating that the recent request regarding Plaintiff's credit information does not appear to have been sent directly by Plaintiff nor authorized by Plaintiff. Defendant further stated that it has not taken action on Plaintiff's dispute request.

166.    Thereafter, Defendant Experian failed to correct or delete the collection notation which caused the generation of the "B0009" reporting about Plaintiff, appearing in Plaintiff's credit file.

167.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered September 16, 2024, or any reinvestigation whatsoever, to determine whether the

disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A); it failed to provide him with a copy of all of the information in his credit file as required by 15 U.S.C. § 1681g(a)(1); and failed to do the bare minimum required by the FCRA to transmit the dispute and relevant information to the furnisher under 15 U.S.C. § 1681i(a)(2).

## I.    Plaintiff's Third Dispute to Defendant Regarding the Inaccurate Credit Reporting

168.    As of October 4, 2024, Defendant continued reporting that Plaintiff had a collection notation associated with his child support enforcement account.

169.    On October 4, 2024, beyond frustrated that Experian refused to reinvestigate this false information, which would continue to appear in his Experian report despite Plaintiff's efforts to dispute the Defendant's inaccurate reporting, Plaintiff again mailed a written dispute about the collection notation associated with his child support enforcement account.

170.    Plaintiff explained that he was denied his credit application submitted because of this collection notation that was reported through Experian's conveyance of the "B0009" code, leading to subsequent distress, uncertainty, and bafflement that Plaintiff experienced by reviewing the inapplicable reasons that Santander provided for the denial of his credit application such as chargeoffs, repossession, judgement, and bankruptcy.

171.    Plaintiff explained the October 2019 incident in question as having resulted because of a stolen money order leaving Plaintiff in arrears of $250.00. Plaintiff explained that he nevertheless paid $500.00 the month of October to cover the outstanding and current amounts owed.

172.    Plaintiff stated that at no point did this child support enforcement account enter collection as it was closed that very same month of October 2019 after his last payment.

173.    Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

174.    Upon information and belief, Experian has published the Plaintiff's consumer information to third parties either containing this erroneous collection information or supplied consumer information about the Plaintiff to third parties that was affected by the presence of the collection notation.

**J.    Defendant Experian's Unreasonable Reinvestigation**

175.    Upon information and belief, Defendant Experian refused to conduct any reinvestigation of the Plaintiff's September 16, 2024, dispute, utilizing the same illegal suspicious mail policy described in paragraphs 88 through 149.

176.    Specifically, by letter dated November 4, 2024, Defendant issued a response to Plaintiff's October 4, 2024, dispute stating that the dispute did not appear to have been authorized or sent directly by Plaintiff. As such, Defendant further informed Plaintiff that it has not taken any action on Plaintiff's dispute.

177.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered September 16, 2024, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A); it failed to provide him with a copy of all of the information in his credit file as required by 15 U.S.C. § 1681g(a)(1); and failed to do the bare minimum required by the FCRA to transmit the dispute and relevant information to the furnisher under 15 U.S.C. § 1681i(a)(2).

178.    Thereafter, Defendant Experian failed to correct or delete the collection notation appearing in Plaintiff's credit file.

179.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's October 4, 2024, dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

180.    Plaintiff reasonably believes that Defendant continues to publish consumer information about the Plaintiff that either has a collection notation associated with his child support enforcement account or incorporates the negative collection information that detracts from his credit standing and credit worthiness as it reflects a serious delinquency.

181.    As a result of the collection notation, and despite Plaintiff's multiple disputes that fell on deaf ears, Defendant made it practically impossible for Plaintiff to continue to obtain credit.

182.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

183.    At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

184.    As a standard practice, the Credit Reporting Bureaus (especially Defendant Experian) do not conduct independent investigations in response to consumer disputes. Instead, they merely transmit an automated consumer dispute verification electronically to furnishers and then parrot back the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the

burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

185.    In this case, Experian did not transmit any information about the dispute to the furnisher child support enforcement agency.

186.    The Credit Reporting Bureaus, especially Defendant, are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendant's violations of the FCRA are deemed willful.

187.    Defendant is especially on notice of its shortcomings because Plaintiff provided multiple disputes delineating the facts, providing detailed information, confirming he authorized the dispute, provided his proof of identity, and even switched the kind of envelope to a handwritten envelope in the hope that Experian would reinvestigate and correct Plaintiff's credit reports and files.

188.    Despite Plaintiff's repeated requests, Experian also failed and refused to send him his credit file to which he was entitled and which he requested, thus he was deprived of learning all the information and the identity of the sources that Experian had in its files that may be causing the inaccurate and misleading reporting.

189.    As a direct result of Defendant's inaccurate reporting and subsequent refusal to reinvestigate or provide Plaintiff with his file, Plaintiff experienced significant injuries, including loss of credit opportunities, diminished ability to rely on his creditworthiness, and lasting harm to his credit rating. He spent extensive time, money, and labor attempting to learn about the source

or and to correct these inaccuracies, leading to inaccurate information remaining in his file, deep frustration, anxiety, and distress. Plaintiff suffered physical injuries and sickness such as sleeplessness and panic, as well as feelings of anxiety, humiliation, and helplessness over the perceived destruction of his credit standing that he worked so diligently to maintain. The inaccurate report left him fearful of being financially unprepared in the event of an emergency and feeling as though his diligent efforts to maintain a strong credit profile had been undermined.

190.    Compounding this harm, Defendant's reporting error triggered a separate legal action Plaintiff pursued against Santander, which, due to Santander's flawed automated programming, provided inapplicable reasons for his credit denial—namely, charge-off, repossession, bankruptcy, or judgment. This led Plaintiff to believe that his credit had been compromised, forcing him to defend his financial reputation and rights under the Equal Credit Opportunity Act (ECOA) Section 1691(d)(3). This action would not have occurred had Defendant ensured the maximal possible accuracy of Plaintiff's credit reports and files.

191.    The time and energy required to pursue reinvestigation of his consumer report and to learn about the sources of the erroneous information resulted in this litigation, which was rooted in Experian's initial inaccurate reporting, and has resulted in considerable mental anguish and lost productivity through countless hours of lost work, further intensifying Plaintiff's distress and humiliation, and further detracting from Plaintiff's financial stability and resources needed to maintain his livelihood and well-being.

## CLAIMS FOR RELIEF

## COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

192.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

193.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

194.    Experian prepared patently false consumer reports concerning Plaintiff.

195.    Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

196.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

197.    As a direct result of Defendant's inaccurate reporting and subsequent inaction, Plaintiff experienced significant injuries and resulting damages described in paragraph 188-191.

198.    Defendant's conduct, actions, and inactions were willful, rendering it liable for actual, statutory damages, and punitive damages pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

199.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation

200.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

201.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

202.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

203.    On at least three occasions during the past two years, Plaintiff disputed the inaccurate information with Experian and requested that it correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the collection notation reported about his child support enforcement account.

204.    In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

205.    Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notices of dispute from Plaintiff; and

by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

206.    As a direct result of Defendant's inaccurate reporting and subsequent refusal to conduct even the most basic reinvestigation, Plaintiff experienced significant injuries and resulting damages described in paragraph 188-191.

207.    The Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

208.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681g(a)**
**Failure to Provide a Disclosure**

209.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

210.    The FCRA mandates that a CRA must clearly and accurately disclose to the consumer upon request all information in the consumer's file at the time of the request and the sources of the information, among other information, upon a showing of proper identification.

211.    Government-issued identification is sufficient identification for this purpose.

212.    Plaintiff provided more than sufficient identification, even though upon information and belief Experian never reviewed Plaintiff's identifying information since it merely refused to read his dispute based on the envelope or the batch that it was in.

213.     By refusing to provide the Plaintiff with his credit file to which he had a right, Experian further deprived him of the right to learn of the information source, to attempt to correct the inaccuracies directly with the furnisher of the false information, or to take other corrective action. Because the child support enforcement agency records do not show a collection or arrearage, it is possible if not likely that some other source is responsible for the false and misleading information.

214.     Because of Experian's refusal to provide the Plaintiff with the contents of his credit file, including the sources of the harmful information, Plaintiff was and continues to be injured by Experian's embargo on information to which he is entitled, and which could enable him to correct erroneous information despite Experian's conduct to keep the Plaintiff from taking action to learn about and correct his credit file.

215.     As a direct result of Defendant's inaccurate reporting and subsequent refusal to conduct even the most basic reinvestigation, Plaintiff experienced significant injuries and resulting damages described in paragraph 188-191, 213-214.

216.     The Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

217.     Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a)       Declaring that Defendant negligently and/or willfully violated the FCRA;

b)      Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)      Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: January 6, 2025,                    **CONSUMER JUSTICE LAW FIRM**

By:     _/s/ Levi Y. Eidelman_
        Levi Y. Eidelman
        72-47 139th Street
        Flushing, New York 11367
        T: (718) 360-0763
        F: (480) 613-7733
        E: leidelman@consumerjustice.com

        *Attorneys for Plaintiff Juan B. Almanzar*